

**FILED**

APR 05 2023 ᴸᴹ

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION AT CHICAGO**

| | | |
|---|---|---|
| **SETRENNIA READUS,** | ) | **1:23-cv-02153** |
| | ) | Judge Martha M. Pacold |
| *Plaintiff,* | ) | Magistrate Judge Young B. Kim |
| | ) | RANDOM |
| v. | ) | |
| | ) | Case No.: _____ |
| **AAYU CLINICS a/k/a** | ) | |
| **LAKEVIEW IMMEDIATE** | ) | Honorable Judge _____ |
| **CLINIC LLC,** | ) | |
| | ) | Honorable Magistrate Judge _____ |
| *Defendant.* | ) | |
| | ) | |
| | ) | |

## PLAINTIFF, SETRENNIA READUS' COMPLAINT WITH DEMAND FOR JURY TRIAL

Plaintiff, SETRENNIA READUS ("Plaintiff" or "Readus") files her Complaint against AAYU CLINICS, a/k/a LAKEVIEW IMMEDIATE CARE, LLC ("Employer" or "AAYU"), and with respect to her claims of actionable discriminatory and retaliatory conduct on behalf of the Defendant, states the following:

### NATURE OF THE CLAIMS

1.  This action is for monetary damages and injunctive relief, pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq* (hereinafter "Title VII"), and Title I of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101 et seq. (hereinafter the "ADA").

2.  This action is to address Defendant's unlawful employment practices against Plaintiff as a person of color, and a disabled person, including discrimination, harassment, hostile work environment, and retaliation.

3.      Plaintiff alleges that Defendant engaged in a pattern and practice of discrimination and the promulgation of a hostile work environment, intentionally and systemically, based on Plaintiff's race as an African American, and her health conditions as a person with a disability.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the Title VII claims herein pursuant to 42 U.S.C. § 2000e, as this action involves federal questions regarding deprivation of Plaintiff's civil rights as a person of color.

5.      This Court has jurisdiction of the ADA claims herein pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding deprivation of Plaintiff's civil rights, as a person with a disability.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to these actions, including Defendant's unlawful employment practices alleged herein, occurred in this District.

## THE PARTIES

7.      Plaintiff is a citizen of the United States, and is and was at all material times herein, a resident at 8434 S. Michigan Avenue, Chicago, IL 60619.

8.      Defendant is a for-profit limited liability company which offers medical and health related services to its clients. Its relevant office is located at 1645 W School Street, #A, Chicago, IL 60657.

9.      At all relevant times herein, the Defendant is an employer as defined by all laws under which this action is brought and employs the requisite number of employees.

## ADMINISTRATIVE REQUIREMENTS

10.     Plaintiff is compliant with all statutory and administrative prerequisites in advance of filing this action.

11.     On or about June 24, 2022, Plaintiff cross-filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Illinois Department of Human Rights ("IDHR"), ***EEOC Charge No.: 21 B-2022-00748, IDHR Charge No. 2022CF1528***.

12.     The Plaintiff's charge was filed within the timeframe set by the EEOC and/or IDHR, within 300 and 180 days, respectively after the alleged unlawful employment practices occurred.

13.     On or about January 3, 2023, Plaintiff received the Notice of Rights to Sue issued on behalf of the EEOC. *See Notice of Rights to Sue attached* as **Exhibit 1**.

14.     This Complaint followed the EEOC's regulations, and thus was filed within ninety (90) days of the receipt of Notice of Rights to Sue.

## FACTUAL ALLEGATIONS

15.     Plaintiff began her employ with the Defendant, AAYU in or about, November 2021.

16.     Plaintiff was hired as a Patient Coordinator, supporting the clinic's front desk team.

17.     However, per Plaintiff's offer letter, and subsequent conversation with Aayu Owner/Operator, Dr. Abhijit Shinde ("Shinde"), Readus was set to transition into Lead Front Desk Coordinator/Front Desk Manager, with subordinate under her employ within the first month of her employment.

18.     Toward the commencement of Plaintiff's initial formal job training, on or about December 6, 2021, as acknowledgment of her stellar work performance, Plaintiff received her sign-on bonus, and had a trainee, Ale Cook ("Cook") placed in her tutelage.

Plaintiff Inquires About her Position and Possible Pay Differential

19.     On or about December 19, 2017, Plaintiff inquired with her supervisor Sharlene Avila (hereinafter "Avila") with respect to clarification of her assigned position as Front Desk Lead and a possible salary increase.

20.     In addition, upon information and belief, during Plaintiff's tenure as an employee of AAYU, lesser qualified individuals, overwhelmingly non-black minorities and/or European or Caucasian persons were promoted to and/or placed in the upper management and/or similarly aligned roles, in favor of those persons overqualified persons, specifically African Americans.

21.     Accordingly, with respect to AAYU's global leadership structure such aforementioned discriminatory practices which have excluded qualified persons of color have and continue to negatively and disproportionately affect African Americans and minorities.

Employer/Agent Dr. Abhijit Shinde Racially Discriminates Against Readus and Creates a Hostile Work Environment

22.     After completing her training and while training Cook, Readus was tasked by Avila and Dr. Shinde with overseeing the day-to-day duties of two non-black staff members, "Sabrina" (a Caucasian/white female}, and "Sarah" (an Asian/non-black female).

23.     However, due to Dr. Shinde's instruction for Readus to keep her role as front desk lead a "secret"[1], the same created a hostile work environment for Readus.

24.     Insomuch as her two subordinates while at first cordial and congenial immediately became hostile toward her after it was revealed that they were to take orders from a black woman.

25.     The above allegations are supported by the fact that both Sabrina and Sarah immediately began to complain to management albeit unsubstantiated about Readus' "attitude", her "aggression", and her being "violent".

26.     Yet and though these accusations were made consistently there was no evidence or documentation provided to management or Readus which would confirm these racially charged allegations.

---

[1] It should be noted that none of the other non-black management had to agree to such a task when offered a management position.

4

27.     In society it is widely known that the above words and language regarding black people, especially black women is derogatory, and all of the above comments and statements made were meant to portray Readus as the archetypal "angry black woman".

28.     This detestable stereotypical trope has been utilized in all aspects of society to characterize black women and to lessen their status in their communities, professions, and culture. According to a recent article published in the Harvard Review entitled *The "Angry Black Woman" Stereotype at Work* the authors note:

> **"The angry Black woman stereotype has penetrated many parts of American culture, including the workplace. This pervasive stereotype not only characterizes Black women as more hostile, aggressive, overbearing, illogical, ill-tempered and bitter, but it may also be holding them back from realizing their full potential in the workplace — and shaping their work experiences overall".**

29.     Nevertheless, and shockingly, this racially charged environment was perpetuated by Dr. Shinde himself.

30.     In example, in or about mid-December 2021, Readus was called into an impromptu meeting to discuss her "implied attitude" and her "aggressive behavior".

31.     During this façade of a meeting, Readus was berated with a barrage of unsubstantiated and baseless allegations.

32.     Some of these include but are not limited to her being called "ignorant", "loud" "violent", and "aggressive", all of which came from Dr. Shinde.

33.     Before ending the meeting, and even more shocking and horrendous, Dr. Shinde informed Readus that he had purchased a book specifically for her "to read and become familiar with", entitled *Nonviolent Communication,* see the screenshot attached as **Exhibit 2**.

34.     These contemptable actions of Dr. Shinde and Aayu are discernably volatile and have caused Readus to suffer, as she was placed in a lesser condition of employment than her non-black

colleagues in leadership, as none of them had been subjected to the racially based derogatory comments and insinuations.

35.     Further none of them had been provided with a specifically purchased book on how to become less "violent".

36.     Dr. Shinde and his staff's actions are in direct violation of Title VII which stipulates that all employees are to be free from workplace harassment and lessened conditions of employment based upon race.

37.     For these reasons and all those detailed above Aayu and Dr. Shinde are liable as stated in the act.

<u>Plaintiff Is Prejudiced Due to Temporary Disability</u>

38.     In or about late December 2021, Readus tested positive for COVID-19 as a result of the work environment.

39.     According to Johns Hopkins Medicine, "COVID-19 can be severe, and has caused millions of deaths around the world as well as lasting health problems in some who have survived the illness".

40.     Moreover, and as we all have been impacted by the emergence and surge of this deadly disease, Readus not only did her due diligence as a well-informed healthcare professional by informing Aayu in order to stop any potential spread, but due to becoming symptomatic, she immediately requested the appropriate time from work (at the time ten [10] days), and stayed home to recover.

41.     However, and instead of Readus being commended by her Employer, the healthcare conglomerate of Aayu she was condemned, harassed, and retaliated against by the very people and company who should have provided her with invaluable support during such a tumultuous time.

42.     As what can only be described as a pattern and practice, Shinde, Avila, and Aayu neglected to respect Readus' rights to be free from harassment, discrimination or retaliation as it relates to approved leave.

43.     Readus was subjected to near daily hostile, harassing, and unsubstantiated texts and communication while on approved COVID leave.

44.     As Readus had already provided a through and efficient coverage plan which was implemented without delay during her leave – this was not enough for Aayu or its agents, and Readus suffered because of the latter's actions.

45.     As Readus' COVID leave began approximately on or about December 21, 2022, prior to the CDC amending guidelines in January 2022, Complainant followed the protocols as was the procedure for that time.

46.     Due to this increased hostility and fear that her job would be terminated, Readus began suffering anxiety attacks.

47.     As a direct and immediate result of the job-related stress, undue pressures and hostile work environment Readus was diagnosed with anxiety disorder in or about early January 2022.

48.     Further, and despite having already laid out a plan and return to work date to Avila and Aayu, upon her return to work from leave on or about January 3, 2022, Readus returned to the office to find her desk and belongings "cleared out" and all of her access to Aayu systems terminated.

49.     Upon seeking clarity from Avila and Dr. Shinde, Readus was told that they assumed she "wasn't coming back".

50.     Further and more egregious, Readus had remained in contact with Avila throughout her Covid leave and had previously provided the date of her return given the 10-day mandate.

51.     Yet and still, she was subjected to the differential treatment of effectual termination due to her contracted Covid, whilst no other leadership or staff employee had been subjected to the same.

52.     Readus saw and believes this action and behavior of Dr. Shinde and Aayu to be discriminatory and hostile in retaliation for her taking the necessary Covid leave, all of which is in

strict violation of the state, federal, and the laws and regulations made clear by the Governor of Illinois and the judiciary at that time.

Employer Retaliates Against Readus Via Termination

53.     In addition to the above apparently volatile actions committed against Readus by Dr. Shinde and Aayu, the retaliation and harassment did not end upon Readus' return to work.

54.     In fact, such actions continued and increased in earnest. It is of importance to note that at every instance of the derogatory comments made, and the harassing actions purported upon Readus, she reported to both Avila and Dr. Shinde that she felt that she was been harassed and treated differently due to her race, and because she had taken the Covid leave.

55.     Nonetheless neither Avila nor Dr. Shinde responded to Readus' reports and continued to treat her differentially than their other non-black staff and leadership employees.

56.     In example, sometime in January in order to curb the near daily volatile actions of Avila and Dr. Shinde, Readus implemented a weekly check-in process meant to give management a chance to bring any concerns or issues regarding performance to Readus.

57.     Stunningly, and even though these meetings were scheduling recurring where management was invited, neither Avila or Dr. Shinde were present, and sometime in March 2022, Avila terminated the meetings.

58.     One would expect Avila and/or Dr. Shinde to at least attend one of the many meetings scheduled in order to discuss the alleged concerns both purported to have with Readus, yet this was not the case.

59.     On or about March 31, 2022, Readus was unexpectedly terminated from Aayu, with the reason given as "gross misconduct". See attached *Termination Correspondence* as **Exhibit 3**.

60.     However no previous warnings, write-ups, or verbal warnings had been given preceding the termination, save the pretextual "first and final" warning given in January, where no evidentiary support was provided to back the baseless allegations against Readus.

8

61.     Aayu had several chances to expound upon the actions leading to the "gross misconduct" allegation but failed to do so.

62.     Additionally, and given recent developments, during an ongoing Administrative Law process with the Illinois Department of Employment Security (IDES), it was revealed in the hearing testimony that the stated reasons for Readus' ultimate discharge by Aayu varied significantly.

63.     In fact, the Hearing Officer, ALJ Barbara J. Heathfield remarked:

> "The evidence failed to prove that the claimant was discharged for misconduct within the meaning of Section 602A of the Act. A finding of misconduct required proof by a preponderance of the evidence that the claimant was discharged for deliberately and willfully violating the employer's rules or policies Turning off the ringer would be a violation of policy. however the claimant's first hand testimony was that she never turned off the ringer and the employer witnesses did not observe her doing so There were problems with the phone system during the time that the employer decided the claimant was turning off the ringer The employer did not elaborate on the reasons for the discharge that were given to the claimant in writing in her discharge letter Turning off phone ringers was not mentioned in the discharge letter The weight of the evidence failed to prove misconduct under the law".

64.     Moreover, during extensive IDHR investigation it was revealed that Defendant had multiple and continuous opportunity to act as a reasonable Employer would and take swift action against Plaintiff for allegedly turning off the ringer on the first alleged instance in or about January 2022, however this was not the case.

65.     Employer in fact never took any substantive action against Readus for allegedly "turning off the ringers" at any time up and until the unwarranted and discriminatory termination, approximately two (2) months later on or about March 31, 2022.

66.     Thus, and for these reasons it is Readus' belief and theory that any details presented by the Employer which deem her termination to be non-discriminatory are to the contrary, and further Employer's reasoning for the same was baseless and pretextual.

## COUNT I
## RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C § 2000, *ET SEQ.*

67.      In the alternative and without prejudice to any of Plaintiff's other claims, Plaintiff re-states and re-alleges every allegation contained in Paragraphs 1 through 64 of this Complaint as though set forth more fully herein.

68.      At all relevant times regarding this action, Plaintiff is a protected employee within the meaning of Title VII of the Civil Rights Act.

69.      Plaintiff was always relevant herein, an African American person employed by the Defendant.

70.      Thus, and pursuant to the protections of this statute, the Defendant is prohibited from engaging in discriminatory practices based upon race, relevant to hiring, employee compensation, terms and conditions of employment, privileges of employment and discharge.

71.      The Defendant has violated Title VII of the Civil Rights Act regarding Plaintiff, insomuch as it has unlawfully disregarded the rights of Plaintiff to be situated similarly regarding job status, and conditions of employment in the same manner as AAYU's non-black, white and/or Caucasian employees within her role and position.

72.      Further, Defendant engaged in prohibited activity upon allowing its agent/owner, Dr. Shinde to spew racially charged language and epithets against Readus describing her as "ignorant", "aggressive", and "violent", all without cause – demoralizing her in front of colleagues and peers on multiple consistent occasions.

73.      Upon information and belief of Plaintiff, Dr. Shinde did not subject any of his non-black colleagues to this racially divisive or hostile treatment.

74.      These actions of Dr. Shinde were pervasive and consistent in that Shinde routinely subjected Readus to the heinous name-calling and moreover increased these behaviors during office meetings on a weekly basis, specifically from December 2021 to March 2022.

75. Additionally, in or about December 2021 or January 2022, during one office meeting, Dr. Shinde verbally assaulted Readus, remarking without evidence or support that her communication was "overly aggressive" with staff, and she was deemed "volatile".

76. To this end, Dr. Shinde informed Readus that he had "personally purchased" from Amazon a book for her to "read and become familiar with", entitled *Nonviolent Communication*.

77. No other non-black employees were provided with this book.

78. Considering the above most unwarranted events, no substantive sensitivity or workplace inclusion training was conducted or specified, even as Plaintiff regularly complained to Dr. Shinde of her concerns regarding racial discrimination, and to Office Manager, Avila.

79. As an ultimate result Plaintiff was terminated without just cause on March 31, 2022 for factors related to her race.

80. Based upon the above, the Defendant willfully and intentionally discriminated against Plaintiff based upon her race and ethnicity.

81. As a direct and proximate result of Defendant's actions and conduct, Plaintiff has and continued to suffer, lost wages, lost benefits, as well as mental and emotional anguish, including but not limited to humiliation, embarrassment, stress and anxiety.

82. Due to the above losses experienced by Plaintiff, she is entitled to an award for monetary damages and other relief as deemed appropriate by this court.

83. Further, Defendant's unlawful action in violation of Title VII of the Civil Rights Act is malicious and intent on damaging Plaintiff, as same has been conducted in conscious disregard of Plaintiff's civil rights, this entitles Plaintiff to an award of exemplary and/cr punitive damages.

**WHEREFORE**, Plaintiff respectfully requests judgment against the Defendant as follows:

a. Order the Defendant to pay compensatory damages in an amount certain to be proven at trial;

b. Order the Defendant to pay punitive damages in an amount certain to be proven at trial;

c. Award Plaintiff reasonable attorneys' fees, expert fees, or any other fees or costs associated with prosecuting this action; and

d. Award Plaintiff pre- and post-judgment, interest, costs, and such other further relief this Court may deem just and appropriate.

## COUNT II: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

84. Plaintiff re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1-83 above.

85. At all times relevant to this action, Plaintiff was a qualified individual with a disability within the meaning of the ADA.

86. Plaintiff had contracted COVID-19, an actual disability, and as such she had a record of being disabled, and/or was perceived as being disabled by Defendant.

87. Defendant was prohibited under the ADA from discriminating against Plaintiff because of Plaintiff's disability with regard to discharge, employee compensation, and other terms, conditions, and privileges of employment.

88. Defendant violated the ADA by unlawfully discriminating against Plaintiff based on Plaintiff's disability by harassing her while on COVID leave, and "clearing out" her workspace.

89. Defendant intentionally discriminated against Plaintiff based on Plaintiff's COVID diagnosis.

90. Though Avila had secured definite return to work date from Readus within three (3) days of her being off, she along with Shinde still proceeded to constructively terminate Readus by removing her access to internal systems and discarding her belongings.

91. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the ADA, Plaintiff has suffered and continued to suffer, lost wages, lost benefits, as well as severe mental anguish and emotional distress, including but not limited to depression, humiliation,

embarrassment, stress and anxiety, loss of self-esteem and self- confidence, and emotional pain and suffering, for which Plaintiff is entitled to an award of monetary damages and other relief. Defendant's unlawful conduct in violation of the ADA is outrageous and malicious, intended to injure Plaintiff, and has been done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of exemplary and/or punitive damages.

**WHEREFORE**, Plaintiff respectfully requests judgment against the Defendant as follows:

a. Order the Defendant to pay compensatory damages in an amount certain to be proven at trial;

b. Order the Defendant to pay punitive damages in an amount certain to be proven at trial;

c. Award Plaintiff reasonable attorneys' fees, expert fees, or any other fees or costs associated with prosecuting this action; and

d. Award Plaintiff pre- and post-judgment, interest, costs, and such other further relief this Court may deem just and appropriate.

## COUNT III: RETALIATION IN VIOLATION OF THE ADA

92.     Plaintiff re-alleges and adopts, as if fully set forth herein, the allegations stated in Paragraphs 1-91, above.

93.     Plaintiff engaged in protected activity under the ADA while employed by Defendant.

94.     Defendant engaged in intentional retaliation against Plaintiff for Plaintiff's participation in protected activity, specifically Plaintiff's taking of approved COVID leave.

95.     Defendant's conduct violated the ADA.

96.     Plaintiff has satisfied all statutory prerequisites for filing this action.

97.     Defendant's discriminatory conduct, in violation of the ADA, has caused Plaintiff to suffered a loss of pay, benefits, and employment status for which Plaintiff is entitled to damages.

98.     Defendant's actions have caused Plaintiff to suffer mental and emotional distress, entitling Plaintiff to compensatory damages.

99.     Defendant has engaged in discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights, thereby entitling Plaintiff to punitive damages.

**WHEREFORE**, Plaintiff respectfully requests judgment against the Defendant as follows:

a.  Order the Defendant to pay compensatory damages in an amount certain to be proven at trial;

b.  Order the Defendant to pay punitive damages in an amount certain to be proven at trial;

c.  Award Plaintiff reasonable attorneys' fees, expert fees, or any other fees or costs associated with prosecuting this action; and

d.  Award Plaintiff pre- and post-judgment, interest, costs, and such other further relief this Court may deem just and appropriate.

Dated this <u>3rd</u> day of April 2023                                          Respectfully Submitted,

Setrennia Readus                                                          By: <u>/s/ Setrennia Readus</u>
*Pro Se Litigant*                                                                       *Pro Se Litigant*
8434 S. Michigan Avenue
Chicago, IL 60619
P: 773-544-1917
E: sreadu2@gmail.com

## JURY DEMAND

NOW COMES Plaintiff, Setrennia Readus, pro se and respectfully requests that this court hold a

trial by jury on all merit-based claims herein.

Respectfully Submitted,

<u>/s/Setrennia Readus</u>

# EXHIBIT 1

 Aayu Clinics



November 3, 2021

Setrennia Readus
sreadu2@gmail.com
Via electronic mail

Full-Time Employment Offer: Patient Coordinator

Dear Ms. Readus,

We are pleased and excited to extend to you this offer of employment as Patient Coordinator for Aayu Clinics. Your start date will be based upon your availability and available training slots. You will report to the Practice Manager, at present Sharlene Avila.

Upon acceptance of this offer of employment, you will receive the employment agreement with details of the bonus and compensation structure.

Compensation and Bonus

1. **Training Period**

**Training Pay** You will begin a 4-week training period and during this time your annual salary will $47,320.00 ($22.75 per hour), paid according to our normal payroll practices, less applicable deductions for Social Security, Medicare, and federal and state employment taxes as directed by you.

**Completion of Training Period** At the end of the training period, you will undergo a skills and knowledge assessment to evaluate your ability to independently perform your role. Based on your ability to complete training and a successful review when you can begin working independently, your salary structure will be changed, and you will be paid the tiered base compensation.

2. **Post-Training Employment: Signing Bonus & Compensation Structure**

**Signing Bonus** Upon successful completion of the training period, you will receive the signing bonus of $2,000.00, less applicable deductions for Social Security, Medicare, and federal and state employment taxes payable in the pay period following the date of completion of the training period.

**Base Compensation** The Practice will pay an initial starting annual salary of $51,084.80, paid according to our normal payroll practices, less applicable deductions for Social Security, Medicare, and federal and state employment taxes as directed by you.

---

 Aayu Clinics



**Tiered Compensation** It is anticipated that you will progress to the role of a Lead Patient Coordinator. After completion of a period of 90-days post-training employment where you function independently, you will undergo a performance evaluation with the CEO. Based on a successful evaluation where you are able to the exceed expectations of your role, you are eligible for a subsequent salary increase commensurate with the role and responsibilities.

**Performance-Based Bonus** In addition, you are eligible for annual performance-based bonuses.

Full-Time Position

Given your position's duties, we are classifying it as an exempt position, consistent with the federal Fair Labor Standards Act (FLSA); therefore, you are not eligible for overtime pay if you work over forty hours in a workweek. We don't anticipate that your role will require overtime.

Your position is being classified as a full-time position, which is defined as working for forty (40) hours per week. You will be scheduled between the hours of 6:45 a.m. to 9:30 p.m. Your scheduled hours will be based upon both the needs of the clinic and upon your own needs and requests. Please also know that because our Clinic is open seven days per week you are being hired with the expectation of working weekend hours.

Employee Benefits

As a regular, full-time employee, you will be eligible for the standard benefits package for full time employees after thirty days from your date of regular, full-time employment.

Key Expectations of Position

In order to be clear about the expectations and responsibilities of this position we will provide you with a position description upon your hire.

Probationary Period

There will be a probationary period of 6 months in which you will go through extensive training and must meet the requirements of the position. During the probationary period, if you do not meet the position requirements, Aayu Clinics reserves the right to dismiss you for, but not limited to, unsatisfactory performance, misrepresentation of qualifications and/or lack of productivity. Please note that this job offer is being conditionally extended to you, based upon your stated skills and experience, and is subject to an employment performance and background verification check. You will undergo assessments during the first 6 months of employment to verify your stated skills and job experience. A gap in the level of your stated and demonstrable skills, and knowledge level may result in termination.

---

 Aayu Clinics



We believe you will make key contributions to the Clinic and we look forward to your start with us! If any one of us can be helpful between now and your start date, please don't hesitate to reach out to us.

Most Sincerely,

_____
Abhijit A. Shinde, MD, PhD
CEO and Medical Director

Acceptance Of Employment

Your acceptance of this employment offer, and the terms and conditions contained therein, is acknowledged by your signature below.

_____
Employee Signature

Nov 3, 2021
_____
Date

Setrennia Readus
_____
Employee Name

www.aayuclinics.com    www.covidarc.com    www.chicagocovid.com
1645 A. W School St, Chicago, IL 60657. 1601 W. Division St., Chicago, IL, 60622. 647 W Randolph St, Chicago 60661. Phone 773.227.3669, FAX 773.687.8366

# EXHIBIT 2

3:35



SA

Sharlene

Mon, Dec 27, 2:39 PM

Hey! How are you doing ?

Getting better still have running
nose and congestion mostly.
How is everything with you?

Good. It's quite busy
Just wondering how you were
feeling
Thanks



Thanks for checking on me.

Wed, Dec 29, 12:21 PM

Good afternoon, hope you are
doing well. I would like to know
when I can come back to work. I
am currently still symptomatic.
When I talked to Holly she said
after 12/31 with no symptoms
since I tested positive on 12/21
for Covid-19. Just wanted an
update.

We should be able to add you to

iMessage

3:35

SA

Sharlene >

since I tested positive on 12/21 for Covid-19. Just wanted an update.

We should be able to add you to the schedule soon. Let's make sure you are symptoms free and re test. Quarantine guidelines have updated to 5 days we are requesting 7 days symptoms free

Ok I am trying to get tested today.

Ok

Thu, Dec 30, 6:18 PM

Hi, are you available to start back tomorrow?

Hello, thanks for checking on me. I can't breath in my mask, I am very congested, and throat is still sore. I am still having symptoms.

Ok. Should we plan for you to

iMessage





3:36

SA

Sharlene

Mon, Jan 3, 3:39 PM

Korotkov, Adam is pt for Covid card

Done

Thanks

You are welcome

Tue, Jan 4, 3:35 PM

Hi! Thank you for your email. We will arrange sometime to meet. Please make sure to test for rapid snd pcr today.

Thanks

Ok I will as soon as I get of break

Np

Fri, Jan 7, 2:47 PM

I have resend you a mobile credential for openpath

This is a way to reset so the

iMessage

# EXHIBIT 3

If "violent" means acting in ways that result in hurt or harm, then much of how we communicate could indeed be called "violent" communication.

# Nonviolent
# COMMUNICATION

## A Language of Life

empathy
collaboration
authenticity
freedom

### 3rd Edition

Words and the way we think matters.
Find common ground with anyone, anywhere,
at any time, both personally and professionally.

# MARSHALL B. ROSENBERG, PhD

## Foreword by Deepak Chopra

Endorsed by Satya Nadella, Arun Gandhi, Tony Robbins,
Marianne Williamson, John Gray, Jack Canfield, Dr. Thomas Gordon, and others